1999 SD 23

**Michael A. VEEDER, Plaintiff and Appellee,**

v.

**Myles KENNEDY, Defendant and Appellant.**

**No. 20360.**

Supreme Court of South Dakota.

Argued Dec. 1, 1998.

Decided Feb. 24, 1999.

Bruce M. Ford, Watertown, South Dakota and Jonathan K. Van Patten, Vermillion, South Dakota, Attorneys for plaintiff and appellee.

David R. Gienapp of Arneson, Issenhuth & Gienapp, Madison, South Dakota, Attorneys for defendant and appellant.

GILBERTSON, Justice.

[¶ 1.] This is an appeal from a jury verdict in an alienation of affections case. Michael Veeder (Michael) brought suit against Myles Kennedy (Kennedy) for alienation of the affections of his former spouse, Julie Veeder (Julie). The jury returned a verdict for Michael granting compensatory and punitive damages totaling $265,000.00. Kennedy appeals. We affirm as to all issues.

## FACTS AND PROCEDURE

[¶ 2.] Kennedy was a management employee of Norwest Bank (Norwest) from 1969 to 1995. In February 1989, Kennedy came to Watertown, South Dakota to head operations at the Watertown branch of Norwest. There he met Julie, who was also employed by Norwest as a personal banker. In 1990, the position of Consumer Banking Manager opened. Since Kennedy did not know the

applicants, he relied on the recommendations of other Norwest employees. They recommended Julie for the position. Julie was offered the job by Kennedy and she accepted it.

[¶ 3.] Her new position required that Kennedy and she work closely together. Over three years they became close friends. In 1993, Julie and Kennedy became involved in a sexual relationship. The affair continued until May 1995. At the time both parties were married.[1] Both Kennedy and Julie expressed their love for each other during this relationship.

[¶ 4.] Julie and Michael were married in 1975. They had three children. Julie testified that her disenchantment with the marriage started when the children were getting older and Michael was not involved with the family. She was raising the children and working full-time. Michael would spend weekend nights during the summer going to various automobile races, he was not involved in the religious upbringing of the children, he did not communicate with Julie and was always concerned about money. He also spent all of his week nights working at the family car wash. As a result Julie's feelings for her husband began to erode.

[¶ 5.] Michael testified that he did not realize there were problems in his marriage. Julie never gave any impression she was unhappy. He claimed the letters that Julie wrote to him after they separated showed she had not lost her affections for him before the affair with Kennedy. Michael contends that any problems in the Veeder marriage surfaced only after Kennedy began having an inappropriate relationship with Julie. She withdrew from Michael and was no longer herself. Michael claims that Julie was vulnerable to a predator such as Kennedy.

[¶ 6.] Michael brought suit for alienation of affections against Kennedy and Norwest. Before trial, Kennedy filed a motion for summary judgment. A motion to dismiss or in the alternative a motion for summary judgment was also filed by Norwest. After a hearing the trial court denied Kennedy's mo-

tion for summary judgment and granted Norwest's motion for summary judgment. After a trial, the jury returned a verdict of $265,000.00 against Kennedy. This figure is composed of $65,000.00 actual damages and $200,000.00 punitive damages. Kennedy filed a motion for a new trial. The motion was denied by the trial court.

[¶ 7.] Kennedy appeals, raising the following issues:

1. Whether public policy requires that South Dakota reexamine and abolish the tort of alienation of affections.

2. Whether the trial court erred in denying Kennedy's motion for a directed verdict.

3. Whether the trial court erred in denying Kennedy's motion for summary judgment.

4. Whether the trial court erred in denying Kennedy's proposed instruction on the elements of the cause of action and in giving instruction number 13.

5. Whether the trial court erred in allowing the introduction of certain prior acts evidence.

6. Whether the trial court erred in denying Kennedy's motion for a new trial.

## ANALYSIS AND DECISION

[¶ 8.] **1. Whether public policy requires that South Dakota reexamine and abolish the tort of alienation of affections.**

[¶ 9.] This question presents a question of law. As such, it will be reviewed de novo. *Webb v. Union Ins. Co.*, 1996 SD 141, ¶ 8, 556 N.W.2d 669, 670.

[¶ 10.] *a. History of the tort alienation of affections.*

[¶ 11.] As the cause of action for alienation of affections is central to all other issues in this case, we begin our analysis with a discussion of this tort. This action is an offshoot of the common law tort for depriving a

---

1. Julie and Michael obtained a divorce in October 1995. Myles Kennedy and his wife of twen- ty-two (22) years are still married.

master of his quasi-proprietary interest in his servant. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 124, at 916 (5th ed 1984). Since under common law women and children were considered property of the husband or father, this tort was extended to include their services. *Id.* The action eventually shifted away from compensation for services to compensation for loss of affection and companionship or perhaps the better known term of consortium. *Id.* The tort was based on the premise that the wife's body belonged to the husband and anyone who trespassed upon the husband's property by seducing his wife was liable for damages.[2] *Russo v. Sutton,* 310 S.C. 200, 422 S.E.2d 750, 752 (1992). *Haney v. Townsend,* 12 SCL (1 McCord) 206 (1821). Conversely, at common law until recently the wife had no such remedy against anyone who interfered in her relationship with her husband. Prosser and Keeton on the Law of Torts § 124, at 916. *See* SDCL 25-2-15 (enacted 1887). *See*

*also Holmstrom v. Wall,* 64 S.D. 467, 268 N.W. 423 (1936) (wife has a cause of action against anyone wrongfully interfering with her marital relationship).

[¶ 12.] Currently, thirty-four states, including the District of Columbia, have statutorily abolished the tort of alienation of affections.[3] However, only five states have done so judicially which is the course of action now advocated by Kennedy. Of the five, four abolished it as a common law doctrine and only one abolished the cause of action which was based upon a statute.[4] One state has statutorily denied money damages for the cause of action.[5] Louisiana has never accepted alienation of affections as a cause of action. *See Moulin v. Monteleone,* 165 La. 169, 115 So. 447 (1927), *accord, Ohlhausen v. Brown,* 372 So.2d 787 (La.Ct.App.1979). Alaska does not have a statute or case law addressing the cause of action. Alienation of affections remains a legitimate cause of action in nine states.[6]

---

2. Of note is the early writ of ravishment. This writ allowed the wife to be listed as one of the husband's chattels. He could use this writ to get his wife back if she was taken by force or left under her own freewill. *See* Prosser and Keeton on the Law of Torts § 124, at 917.

3. States that have abolished the cause of action for alienation of affections: Alabama, AlaCode § 6-5-331 (1993); Arizona, ArizRevStatAnn § 25-341 (West 1991); Arkansas, ArkCode Ann § 16-118-106 (Michie 1997); California, CalCivCode § 43.5 (West 1982); Colorado, ColoRevStat § 13-20-202 (1998); Connecticut, ConnGenStat § 52-572b (1997); Delaware, DelCodeAnn tit 10, § 3924 (1975); District of Columbia, DCCodeAnn § 16-923 (1998); Florida, FlaStat ch 771.01-771 (1997); Georgia, GaCode Ann § 51-1-17 (1990); Indiana, IndCode § 34-12-2-1 (1986); Kansas, KanStatAnn § 23-208 (1995); Maine, MeRevStatAnn tit 14 § 301 (West 1998); Maryland, MdCodeAnn Family Law § 3-103 (1999); Massachusetts, MassGenLaws ch 207, § 47B (1994); Michigan, MichCompLaws § 27A.2901 (1988); Minnesota, MinnStat § 553.01 (1988); Montana, MontCode Ann § 27-1-601 (Smith 1997); Nebraska, NebRevStat § 25-21, 188 (1995); Nevada, NevRevStat § 41.380 (1997); New Jersey, NJStatAnn § 2A:23-1 (West 1987); New York, NYCivRightsLaw § 80-a (McKinney 1992); North Dakota, NDCentCode § 14-02-06 (1997); Oklahoma, OklaStat tit 76, § 8.1 (1995); Oregon, OrRevStat § 30.840 (1997); Pennsylvania, 23 PaConsStat § 1901 (1991); Rhode Island, RIGenLaws § 9-1-42 (1997); Tennessee, TennCodeAnn § 36-3-701 (1996); Texas, TexFamCodeAnn § 1.107 (West 1998); Vermont, VtStatAnn tit 15 § 1001

(1989); Virginia, VACodeAnn § 8.01-220 (Michie 1992); West Virginia, WVaCode § 56-3-2a (1997); Wisconsin, WisStat § 768.01 (West 1998); Wyoming, WyoStatAnn § 1-23-101 (Michie 1997).

4. The following states have judicially abolished the cause of action for alienation of affections: Idaho, *O'Neil v. Schuckardt,* 112 Idaho 472, 733 P.2d 693 (1986); Iowa, *Fundermann v. Mickelson,* 304 N.W.2d 790 (Iowa 1981); Kentucky, *Hoye v. Hoye,* 824 S.W.2d 422 (Ky.1992); South Carolina, *Russo,* 310 S.C. 200, 422 S.E.2d 750; Washington, *Wyman v. Wallace,* 94 Wash.2d 99, 615 P.2d 452 (1980). Only South Carolina abolished the cause of action which had been based upon a statute rather than the common law. *Russo* is hardly persuasive as its basis for abrogation is a misreading of this Court's decision in *Hunt v. Hunt,* 309 N.W.2d 818 (S.D.1981). The *Russo* court interpreted *Hunt* to conclude that South Dakota had abridged our statutory cause of action for alienation of affections when in reality only a minority of the Justices in *Hunt* advocated such a position.

5. Representing Ohio, OhioRevCode Ann § 2305.29 (Page's 1995).

6. Only South Dakota, Illinois, Hawaii, Missouri, Mississippi, New Hampshire, New Mexico, North Carolina and Utah maintain a cause of action for alienation of affections. *See* SDCL 20-9-7; 740 IllCompStat 5/1 (West 1993) (limits damages to actual damage); *Hunt v. Chang,* 60 Haw. 608, 594 P.2d 118 (1979); *Van Vooren v. Schwarz,* 899

[¶ 13.] *b. Alienation of affections
in South Dakota.*

[¶ 14.] South Dakota derives this cause of action from SDCL 20–9–7 [7] which states:

The rights of personal relation forbid:

* * *

(2) The abduction or enticement of a wife from her husband . . . ;

(3) The seduction of a wife, daughter, or orphan sister.

The elements of alienation of affections in South Dakota are as follows:

1. wrongful conduct of the defendant;

2. loss of affection or consortium; and

3. a causal connection between such conduct and loss.

*Pickering v. Pickering,* 434 N.W.2d 758, 762–3 (S.D.1989) (citing *Pankratz v. Miller,* 401 N.W.2d 543, 546 (S.D. 1987); *Hunt,* 309 N.W.2d at 820.)

[¶ 15.] The last time this Court addressed the issue of alienation of affections was in *Pickering.* [8] Over the years we have considered this issue a number of times. *See Pankratz; Hunt; Morey v. Keller,* 77 S.D. 49, 85 N.W.2d 57 (1957); *Pearsall v. Colgan,* 76 S.D. 241, 76 N.W.2d 620 (1956); *Monen v. Monen,* 64 S.D. 581, 269 N.W. 85 (1936); *Holmstrom; Moberg v. Scott,* 38 S.D. 422, 161 N.W. 998 (1917). The most extensive discussion of the possible abrogation of the tort of alienation of affections is found in *Hunt,* 309 N.W.2d 818.

[¶ 16.] In *Hunt,* a plurality decision, the plaintiff Bonnie Hunt (Bonnie) brought suit against Kay Hunt (Kay) for alienation of affections and criminal conversation. *Id.* at 819. Bonnie prevailed on both counts with a jury verdict of $50,000.00. *Id.* at 819. On appeal, Kay requested the torts of alienation

of affections and criminal conversation be judicially abolished. *Id.*

[¶ 17.] The *Hunt* Court traced the history of both causes of action. [9] The Court, found, "[t]he right to recover under the doctrines of alienation of affections and criminal conversation is of common-law origin, and exists independent of any statute." *Id.* at 820, (citing *Holmstrom,* 64 S.D. 467, 268 N.W. 423; *Moberg,* 38 S.D. 422, 161 N.W. 998). The Court considered the national trend of abolishing both criminal conversation and alienation of affections. Justices Henderson and Wollman contended both torts had outlived their usefulness and were "archaic holdovers from an era when wives were considered the chattel of their spouse. . . ." *Hunt,* 309 N.W.2d at 821. (Footnote omitted). The two Justices voted to abolish both causes of action and reverse the judgment of the trial court.

[¶ 18.] Justice Dunn wrote a concurring opinion in *Hunt,* in which Justices Morgan and Fosheim joined. These Justices agreed with Justice Henderson's opinion that the cause of action of criminal conversation should be abrogated. *Id.* at 822–3. The abrogation was necessary in part because the cause of action did not provide any meaningful defenses. *Id.* at 823. However, the three concurring Justices refused to abrogate the cause of action for alienation of affections reasoning that the cause of action had long been recognized by the South Dakota Legislature and therefore should be upheld until repealed by the legislature. *Id.*

[¶ 19.] *c. Does public policy require the
abolition of the tort alienation of
affections.*

[¶ 20.] Kennedy argues that almost all jurisdictions have eliminated this cause of ac-

---

S.W.2d 594 (Mo.App.1995); *Kirk v. Koch,* 607 So.2d 1220 (Miss.1992); *Feldman v. Feldman,* 125 N.H. 102, 480 A.2d 34 (1984); *Coachman v. Gould,* 122 N.C.App. 443, 470 S.E.2d 560 (1996); *Jackson v. Righter,* 891 P.2d 1387 (Utah 1995).

7. This statute was originally codified in 1877.

8. However, in *Hershey v. Hershey,* we addressed a parent's claim of alienation of affections of a child. 467 N.W.2d 484 (S.D.1991).

9. Although Justice Henderson wrote the result which was unanimous, only one Justice joined his writing. Three other Justices concurred in result only as to the ultimate disposition and disagreed concerning the question over abrogation of alienation of affections.

tion [10] and therefore South Dakota should follow the majority of other jurisdictions. Michael's response is that we should follow *Hunt* and preserve the tort until it is repealed by the legislature which is the source of its creation in this jurisdiction.

[¶ 21.] Strong policy arguments have been advanced by members of this Court in favor of abrogation. As two Justices stated in *Hunt:*

> The underlying rationale for alienation suits, that is, the preservation of the marriage, is ludicrous. And it is folly to hope any longer that a married person who has become inclined to philander can be preserved within an affectionate marriage by the threat of an alienation suit.... Where ... neither party holds the marriage in the high regard that it should be held, the existence of ... alienation of affections ... as [a remedy] fosters bitterness, promotes vexatious lawsuits, uses the marriage as a means of blackmail and character assassination, puts the marriage in the marketplace, and generally exposes the marriage to a public cleansing with a price tag attached upon it.

*Hunt,* at 822 (Henderson, J.) (internal citation omitted). However, those Justices in *Hunt* who favored retention of the cause of action did so on policy grounds as well as constitutional deference to the legislative prerogative.

> Finally, because we happen to be living in a period of loose morals and frequent extra-marital involvements is no reason for a court to put its stamp of approval on this conduct; and I feel certain that a case will arise in the future where some party has so flagrantly broken up a stable marriage that we would rue the day that an alienation suit was not available to the injured party.

10. *Supra,* note 3, 4, 5, 6.

11. Factually, this case occurred in a work-place setting. We note that the courts have become increasingly vigilant in protecting workers from sexual harassment by superiors while at work. *See Burlington Industries, Inc., v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

*Hunt,* at 823 (Dunn, J., concurring specially in part, and concurring in result in part). [11]

[¶ 22.] As the common law has progressed it has eliminated those rights and remedies that are deemed no longer justifiable in our society. Kennedy argues authority from those jurisdictions involving abrogation is persuasive; it should encourage this Court to abrogate this cause of action. However, as we stated in *Hunt,* we feel this Court is not the proper forum for resolving this issue.

[¶ 23.] The "public policy" argument of Kennedy cannot be supported by our system of law. SDCL 1–1–23 states that the sovereign power is expressed by the statutes enacted by the legislature. SDCL 20–9–7 which authorizes Michael's cause of action in this case is such a statute. Under SDCL 1–1–24 the common law and thus an abrogation of the common law are in force except where they conflict with the statutory will of the legislature as expressed by SDCL 1–1–23. We are unable to locate a single case in this jurisdiction where this Court has struck down a statute as a violation of public policy. As no constitutional defects are claimed by Kennedy, we are compelled to leave the cause of action intact and instead defer to the legislature's ability to decide if there is a need for its elimination. "[W]e are not legislative overlords empowered to eliminate laws whenever we surmise they are no longer relevant or necessary." *Matter of Certification of Questions of Law (Knowles),* 1996 SD 10, ¶ 66, 544 N.W.2d 183, 197. The law has long recognized that a determination of policy and the duration of that policy remains within the purview of the Legislature. *Id.* "[W]hat the legislature ordains and the constitution does not prohibit must be lawful." *Knowles,* 1996 SD 10 at ¶ 73, n. 20, 544 N.W.2d at 199, n. 20 (citing *State v. Scougal,* 3 S.D. 55, 72, 51 N.W. 858, 864 (1892)).

While Julie claimed to need no such protection and indeed testified the relationship was voluntary, SDCL 20–9–7 extends the protection of the law to the spouse of the worker. Admittedly, the scope of SDCL 20–9–7 is not limited to the workplace but to any factual setting justifying its invocation. However, some of our cases such as *Pickering* commenced as "office romances." 434 N.W.2d 758.

**[¶ 24.] 2. Whether the trial court erred in denying Kennedy's motion for a directed verdict.**

[¶ 25.] Our standard of review on motions for directed verdict is well settled:

A motion for a directed verdict under SDCL 15–6–50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.

*Border States Paving, Inc. v. State, Department of Transportation,* 1998 SD 21, ¶ 10, 574 N.W.2d 898, 901, (citing *Schuldies v. Millar,* 1996 SD 120, ¶ 8, 555 N.W.2d 90, 95 (quoting *Junge v. Jerzak,* 519 N.W.2d 29, 31 (S.D.1994) (citations omitted)); *see also State v. DeNoyer,* 541 N.W.2d 725, 733 (S.D.1995); *Bridge v. Karl's, Inc.,* 538 N.W.2d 521, 523 (S.D.1995)).

[¶ 26.] At the close of Michael's case, Kennedy made a motion for a directed verdict. This motion was renewed after both sides rested. The trial court denied both motions. Kennedy claims the trial court erred in not granting both motions because Michael failed to establish two critical elements in his case: (1) that there were affections in the marriage to alienate; and (2) that Kennedy intended from the outset to entice the affections of Julie away from her husband.

[¶ 27.] In *Pickering* and *Pankratz,* we stated that if there are no affections to alienate, there is no cause of action. *Pickering,* 434 N.W.2d at 763; *Pankratz,* 401 N.W.2d at 546. Viewed in the light most favorable to the nonmoving party, there was sufficient evidence to support the conclusion that there were affections in the marriage to alienate. That there were affections in the marriage can be drawn from the letters written by Julie to Michael after they separated in which she proclaimed: "Mike, I would take my old life back in a heartbeat. I miss my old life." "I wish none of this happened and we could turn back the clock." "I would give anything to have my old life back again." [12] Michael testified they had a loving marriage, that Julie showed him affection "all the time" and the last thing each would say to the other when retiring for the night was, "I love you." This evidence is further substantiated by testimony of family and friends, who thought Julie and Michael had a wonderful marriage before Julie became involved with Kennedy.

[¶ 28.] Furthermore, there was sufficient evidence that Kennedy intended to entice away Julie's affections from her husband. Although Kennedy expressly denied any such intention, the jury could have drawn reasonable inferences and deductions from the facts to conclude to the contrary. *People in Interest of W.Y.B.,* 515 N.W.2d 453, 455 (S.D. 1994). When asked if he felt any guilt about the inappropriate relationship with Julie, he replied no. Kennedy carried on this relationship for over two years, which provides the inference that the enticement was intentional. Furthermore, Kennedy's marriage at the time of the trial was the result of a similar extra-marital relationship with a fellow employee.

[¶ 29.] Clearly, sufficient evidence existed so that "reasonable minds could differ." *Border States Paving,* 1998 SD 21 at ¶ 10, 574 N.W.2d at 901. The trial court did not err in denying the motion for a directed verdict.

**[¶ 30.] 3. Whether the trial court erred in denying Kennedy's motion for summary judgment.**

[¶ 31.] Kennedy advanced the same arguments in his motion for summary judgment

---

12. It is argued that Julie never believed this but instead wrote it to induce Michael to drop this lawsuit and smooth out child custody problems. The problem with this rationale is that Julie was allowed to tell the jury this explanation for the letters. By its verdict, the jury obviously did not accept her explanation and instead chose to believe Michael and the numerous other witnesses who testified there were affections between Michael and Julie to alienate.

as in his motions for directed verdict which we rejected in Issue 2.

**[¶ 32.] 4. Whether the trial court erred in denying Kennedy's proposed instruction on the elements of the cause of action and in giving Instruction number 13.**

Under our standard of review, we construe jury instructions as a whole to learn if they provided a full and correct statement of the law. *Sommervold v. Grevlos,* 518 N.W.2d 733, 739 (S.D.1994); *Frazier v. Norton,* 334 N.W.2d 865, 870 (S.D.1983); *Mueller v. Mueller,* 88 S.D. 446, 450, 221 N.W.2d 39, 42 (1974). Misleading, conflicting, or confusing instructions create reversible error. *Schaffer v. Edward D. Jones & Co.,* 1996 SD 94, ¶ 19, 552 N.W.2d 801, 808; *Wallahan v. Black Hills Elec. Co-op., Inc.,* 523 N.W.2d 417, 423 (S.D.1994). Nonetheless, an appellant must show not only that a particular instruction was erroneous, but also that it was prejudicial, meaning the jury probably would have returned a different verdict if the faulty instruction had not been given. *LDL Cattle Co., Inc. v. Guetter,* 1996 SD 22, ¶ 32, 544 N.W.2d 523, 530; *Sybesma v. Sybesma,* 534 N.W.2d 355, 359 (S.D.1995) (quoting *Chambers v. Dakotah Charter, Inc.,* 488 N.W.2d 63, 64 (S.D.1992)).

*Davis v. Knippling,* 1998 SD 31, ¶ 4, 576 N.W.2d 525, 526–7.

[¶ 33.] Kennedy argues that the trial court erred in submitting jury Instruction 13 to the jury and the prejudice created by the Instruction in this case was significant. Jury Instruction 13 reads as follows:

To recover damages for alienation of affection, the following elements must be proven by a preponderance of the evidence:

1. *Wrongful conduct* of the defendant;

2. Loss of affection or consortium; and

3. A causal connection between such conduct and loss.

(Emphasis added). The defendant proposed the following South Dakota Pattern Jury Instruction 46–01 to the trial court as a substitute for Instruction 13.

To recover damages for alienation of affections, Plaintiff must prove each of the following elements by greater convincing force of the evidence:

(1) Defendant *intended from the outset* to entice the affection of one spouse away from the other.

(2) The acts of the Defendant were the proximate cause of the loss of the affection or consortium of Plaintiff's spouse.

(3) The nature and extent of damages suffered by the Plaintiff as a proximate result of the Defendant's conduct.

(Emphasis added).

[¶ 34.] On appeal, we employ a two prong approach to review jury instructions: "A party challenging as erroneous a jury instruction must show not only 'that the instruction was in error, but also that it was prejudicial error to the effect that under the evidence, the jury ... probably would have returned a different verdict.'" *City of Sioux Falls v. Hone Family Trust,* 1996 SD 126, ¶ 10, 554 N.W.2d 825, 827. (Citing *Chambers v. Dakotah Charter, Inc.,* 488 N.W.2d 63, 64 (S.D. 1992) (citing *Lytle v. Morgan,* 270 N.W.2d 359, 362 (S.D.1978))). Therefore, Kennedy must first show that the instruction was in error. If he meets this threshold requirement he then must show that the jury probably would have returned a different verdict if not for the erroneous jury instruction.

*[¶ 35.] a. Was Instruction 13 a misstatement of the law and therefore erroneous.*

[¶ 36.] Kennedy claims that failure to give his proposed jury instruction was error. He alleges his instruction correctly instructs the jury on the element of intent while Jury Instruction 13 does not mention intent but only "wrongful conduct." Kennedy claims since "wrongful conduct" does not raise to the level of "intentional conduct" the jury was improperly instructed on the element of intent and his case was severely prejudiced.

[¶ 37.] Our case law establishes the essential elements for an alienation of affections cause of action to be:

(1.) wrongful conduct of the defendant;

(2.) loss of affection or consortium; and

(3.) a causal connection between such conduct and loss.

*Pickering,* 434 N.W.2d at 762–63; *Pankratz,* 401 N.W.2d at 546; *Hunt,* 309 N.W.2d at 820 (citing *Morey,* 77 S.D. 49, 85 N.W.2d 57). This "wrongful conduct of the defendant" standard was first recognized by this Court in *Pearsall,* 76 S.D. at 244, 76 N.W.2d at 621. It has, without exception, been followed by this Court in its subsequent decisions. *See Hershey,* 467 N.W.2d at 488; *Pickering,* 434 N.W.2d at 762–3; *Pankratz,* 401 N.W.2d at 546; *Hunt,* 309 N.W.2d at 820; *Morey,* 77 S.D. at 51, 85 N.W.2d at 61. Jury Instruction 13, does not deviate at all from what we have declared to be the elements of alienation of affections.

[¶ 38.] In those cases we held that the wrongful conduct must be intentional.

> It also appears to be the general rule that actual intent to alienate the affections of the spouse of another need not necessarily be shown if defendant's conduct is inherently wrong and tends to, and does, have that effect. In other words every person is presumed to intend the consequences of his own voluntary acts.

*Pearsall,* 76 S.D. at 244, 76 N.W.2d at 621 (citation omitted).[13]

[¶ 39.] When taken together, the instructions provide the jury with more than adequate guidance on the intent requirement that must be met for a plaintiff to carry his or her case. For example, Instruction 12 reads: "[i]t is the law of this state that anyone who *purposely alienates* one spouse's affections from the other spouse is subject to liability...." (Emphasis added). Instructions 11, 14 and 15[14] provided the jury with further instruction as to the intent requirement. The instructions used by the trial court state the law as correctly as does the pattern jury instruction offered by Kennedy.

[¶ 40.] As this was not a misstatement of our law we do not need to reach the second prong of the test.

[¶ 41.] **5. Whether the trial court erred in allowing the introduction of certain prior acts evidence.**

Evidentiary rulings made by the trial court are presumed correct and are reviewed under an abuse of discretion standard. *State v. Oster,* 495 N.W.2d 305, 309 (S.D.1993). The test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion. *State v. Rufener,* 392 N.W.2d 424, 426 (S.D.1986).

*State v. Goodroad,* 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129.

[¶ 42.] SDCL 19–12–5, provides that evidence of prior bad acts is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. Kennedy objected to the admission of evidence that he had an affair with a fellow employee in the 1970's. This affair lead to the breakup of both their marriages. Kennedy and the employee were eventually married. Kennedy contends this information is not admissible under SDCL 19–12–5[15] because it does not meet any of

---

13. The dissent claims that *Pickering* and *Pankratz* "emphasize" the intentional nature of the tort. However, both cases along with those cited above use the "wrongful conduct of the defendant" language adopted by the trial court. Neither Kennedy nor the dissent point to a single case from this jurisdiction which adopts the language of Kennedy's proposed jury instruction. In addition, the language of the instruction proposed by Kennedy was properly rejected by the trial court as it contains the requirement the Defendant "at the outset" intend to entice the affections of one spouse away from the other. This would mean that if Kennedy, at their first business meeting, did not intend to entice Julie away from Michael, the law would provide Mi-

chael no subsequent protection and Kennedy could proceed with impunity at a later time to alienate affections with no legal accountability.

14. Instruction 15 provides in part:

Not only must the actor have caused a diminution of one spouse's affection for the other by acts, but the acts must have been done for the very purpose of accomplishing this result. Unless the acts were done for this purpose, there is no liability even though loss of affection results....

15. SDCL 19–12–5 provides:

Evidence of other ... wrongs, or acts is not admissible to prove the character of a person

the statutory criteria. Furthermore, he argues this information is not relevant and therefore not admissible under SDCL 19–12–1 and even if it is relevant, it is not admissible under SDCL 19–12–3.

[¶ 43.] Michael claims that the evidence was relevant in proving intent. We agree. Alienation of affections is an intentional tort and it was necessary for Michael to prove intent to proceed with his case. SDCL 19–12–5 specifically recognizes "intent" may be proved by "evidence of other ... wrongs, or acts...." As the defendant rarely admits the crucial element of intentional wrongful conduct, it must be established by the plaintiff through circumstantial evidence to avoid being nonsuited.

[¶ 44.] Furthermore, the trial court correctly included the proper limiting instruction, advising the jury that this evidence was received for the purpose of aiding the jury in determining whether Kennedy had the intent required to find him liable and the information could not be used for any other purpose. Kennedy's prior act went to intent and was therefore relevant and admissible.

[¶ 45.] **6. Whether the trial court erred in denying Kennedy's motion for a new trial.**

[¶ 46.] We apply the following standard to our review of the grant of a motion for new trial by the trial court:

The jury's verdict should not be set aside except in those extreme cases where it is the result of passion or prejudice or where the jury has palpably mistaken the rules of law by which damages in a particular case are to be measured. SDCL 15–6–59(a)(5).... If the jury's verdict can be explained with reference to the evidence rather than by juror passion, prejudice or

in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident.

16. Kennedy also sought a new trial on the grounds of Jury Instruction 13, the court's failure to require a preliminary finding in connection with punitive damages and the prior act evidence that was introduced. We find these arguments without merit.

mistake of law, the verdict should be affirmed. *Itzen v. Wilsey*, 440 N.W.2d 312, 313–14 (S.D.1989) (citations omitted).

*Berry v. Risdall*, 1998 SD 18, ¶ 9, 576 N.W.2d 1, 4.

[¶ 47.] Subsequent to the jury verdict, Kennedy filed a motion for a new trial. The motion was denied. Kennedy presents two relevant arguments as to why a new trial should have been granted.[16] First, he claims the damages returned by the jury were excessive and the reason for the excessive damages was that the verdict was given under the influence of passion or prejudice. Second, he contends there was not sufficient evidence to justify the verdict.[17]

[¶ 48.] *a. Excessive damages.*

[¶ 49.] The jury returned a verdict for Michael of $265,000.00, which included $65,000.00 in actual damages and $200,000.00 in punitive damages. Kennedy claims that several events led to "passion or prejudice by the jury."

1. Consistent references by Plaintiff's counsel to Kennedy's New York heritage.

2. Inferences that Kennedy's father was part of the Chase Manhattan "family."

3. References that Kennedy only wanted the relationship for sex which was not supported by the record.

4. References that Kennedy's counsel was counsel for a criminal defendant in a well known South Dakota murder case.[18]

5. Plaintiff's counsel's claims that Kennedy's present wife was lured away from her husband by Kennedy.

17. As we have stated above, we find the evidence was sufficient for the jury to return a verdict for Michael. Therefore, we will not revisit this particular issue.

18. Michael's attorney alludes to the fact that counsel for Kennedy was one of the attorneys for the defendant in *State v. Moeller*, 1996 SD 60, 548 N.W.2d 465.

6. Representing that Kennedy dumped Julie that was not supported by the evidence.

7. Counsel presented inferences that Kennedy gave Julie advances for reasons other than her performance and competence, which was unsupported by the record.

[¶ 50.] Based on the record, we initially find no basis to overturn the compensatory award of $65,000. Kennedy, however, claims these inferences resulted in an excessive award of punitive damages.

[¶ 51.] We have held that the question of whether to award punitive damages and the amount rests with the jury. *Schaffer v. Edward D. Jones & Co.*, 1996 SD 94, ¶ 26, 552 N.W.2d 801, 809 (*Schaffer II*). "Unless the verdict is so large as to clearly indicate that it must have been given under the influence of passion or prejudice, it should stand." *Id.*, 1996 SD 94 at ¶ 26, 552 N.W.2d at 810 (citation omitted). We have adopted a five-factor test to determine whether the punitive award is appropriate or excessive. *Id.*, 1996 SD 94 at ¶ 27, 552 N.W.2d at 810 (citing *Flockhart*, 467 N.W.2d at 479). We will consider:

1. The amount allowed in compensatory damages,

2. The nature and enormity of the wrong,

3. The intent of the wrongdoer,

4. The wrongdoer's financial condition, and

5. All of the circumstances attendant to the wrongdoer's actions.

*Id.*

[¶ 52.] The first factor to be considered is the amount of the compensatory damages and its relationship or ratio to the amount of punitive damages. The amount of punitive damages awarded must bear a reasonable relationship to the compensatory damages. *Grynberg v. Citation Oil & Gas Corp.*, 1997 SD 121, ¶ 38, 573 N.W.2d 493, 504 (citing *Centrol, Inc. v. Morrow*, 489 N.W.2d 890, 896 (S.D.1992)). Here the ratio is 3 to 1. We have upheld numerous other awards with much more substantial ratios than this.[19]

[¶ 53.] The second factor is the nature and the enormity of the wrong. We are bound by the jury's determination based on its verdict that this was an intentional attack on the Veeder marriage in which there existed love and affection between the spouses. A divorce resulted for the Veeders. Three minor children were also the victims of the breakup of their parents. It would be an unacceptable argument that would advocate the loss of one's spouse by intentional misconduct did not exceed the loss of money which was the basis for the punitive damage awards in our recent cases of *Schaffer II* and *Grynberg*.

[¶ 54.] The third factor is the intent of the wrongdoer.

"From intent, we determine 'the degree of reprehensibility of the defendant's conduct,' which is viewed as probably the most important indication of the reasonableness of the punitive damage award." *Schaffer II*, 1996 SD 94 at ¶ 32, 552 N.W.2d at 812 (citing *BMW of North America v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809, 826). Trickery and deceit are more reprehensible than negligence. *Id.* Of a more serious nature would be those acts which result in injury to persons through "indifference to and reckless disregard for the health or safety of other."

---

19. *See Schaffer II*, 1996 SD 94 at ¶ 28, 552 N.W.2d at 810 (30 to 1); *Hoff v. Bower*, 492 N.W.2d 912, 915, (S.D.1992) (27 to 1); *K & E Land and Cattle, Inc. v. Mayer*, 330 N.W.2d 529, 532 (S.D.1983) (35 to 1); *Hulstein v. Meilman Food Industries, Inc.*, 293 N.W.2d 889, 892 (S.D. 1980) (11 to 1). *See also Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206 (8thCir.1990) (applying South Dakota law) (20 to 1). However, in *Grynberg* we cautioned:

Such ratio comparisons however are of limited value. Were there to be some bright-line rule on ratios as Jones implies, the remaining four criteria would become irrelevant and the entire process of judicial review would be reduced to that of a turn at a calculator. We have held '[t]here is no precise mathematical ratio between compensatory and punitive damages.' Therefore, while that ratio [30 to 1] is cause for concern, we must proceed to analyze the other factors to set the ratio matter in perspective.

1997 SD 121 at ¶ 38, 573 N.W.2d at 505 (citing *Schaffer II*, 1996 SD 94 at ¶ 28, 552 N.W.2d at 810–11) (internal citation omitted).

*See BMW*, 517 U.S. at 576, 116 S.Ct. at 1599, 134 L.Ed.2d at 826. The most reprehensible from the intent point of view would be an intentional malicious assault or attack against a person.

*Grynberg*, 1997 SD 121 at ¶ 42, 573 N.W.2d at 506. (Footnote omitted). "Husband and wife contract toward each other obligations of mutual respect, fidelity, and support." SDCL 25–2–1. Here the acts are of the most serious nature as they are intentional towards Michael's marriage with all the corresponding effects, albeit not malicious.

[¶ 55.] As in *Schaffer II*, here the defendant showed no remorse for his acts and so told the jury. "Punitive damages may properly be imposed to further a State's legitimate interests in not only punishing unlawful conduct but also to deter its repetition." *Schaffer II*, 1996 SD 94 at ¶ 35, 552 N.W.2d at 813 (citing *BMW*, 517 U.S. at 568, 116 S.Ct. at 1595, 134 L.Ed.2d at 822).

[¶ 56.] Kennedy focuses on factor four, that his financial condition is not in line with his ability to pay this amount. Kennedy claims that the punitive damage award of $200,000.00 is in excess of 20% of his net worth of $750,000.00. Kennedy does not include his vested retirement, which is a substantial sum of money, in this figure.[20] Michael contends that Kennedy's net worth is $1,568,600.00. This figure is the amount Kennedy testified to at trial. This figure includes the vested retirement. Using this figure the punitive award is only 12 3/4% of his net worth.

[¶ 57.] We agree with Michael. Kennedy's net worth should be what he testified to at trial, $1,568,600.00. The punitive award will have an effect on Kennedy but not enough to shock the conscience of the court. *See Schaffer II*, 1996 SD 94 at ¶ 37, 552 N.W.2d at 813.

[¶ 58.] The fifth factor is consideration of all other relevant circumstances of the case. In both *Schaffer II* and *Grynberg* we focused on whether there were other sanctions available, either civil or criminal, to vindicate the plaintiff. Here none are brought to our attention and there appear to be none.

[¶ 59.] Through a letter by Julie to Michael, the jury was informed the price Michael and Julie paid for the affair and subsequent divorce which the jury found was wrongfully instituted by Kennedy:

Mike ... I wish none of this happened and we could turn back the clock. But I know we can't. They say there's a reason for everything. Don't know what it possibly could be. As I think back, we did have lots of good times. We used to laugh and have fun. For some reason I forgot all that and got my head screwed up.... All I can say is I'm truly sorry I hurt you and the kids. I really never meant to hurt anyone. I would give anything to have my old life back again.

Requiring the instigator of this result to pay a penalty of $200,000 does not shock our conscience.

[¶ 60.] In summary, based on the evidence, none of the five factors favors an overturn or modification of this jury award of punitive damages. As such, we do not find this verdict was the result of passion or prejudice.

[¶ 61.] In conclusion we affirm on all issues.

[¶ 62.] MILLER, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 63.] SABERS, Justice, concurs specially.

[¶ 64.] AMUNDSON, Justice, dissents.

SABERS, Justice (concurring specially).

[¶ 65.] To those who would encourage the legislature to abolish the cause of action for alienation of affection, I remind them of two things:

1. The words of Justice Dunn in *Hunt v. Hunt*, 309 N.W.2d 818 (S.D.1981):

Finally, because we happen to be living in a period of loose morals and frequent extra-marital involvements is no reason for a

---

20. Kennedy also argues that we should take his net worth figure of $750,000.00 and divide it in half, leaving him a net worth of only $375,000.00. This figure comes from his expectation that he will have to give up "half" of his net worth if he ever goes through another divorce. We will not entertain this argument since unlike the Veeder marriage, his marriage survived these events.

court to put its stamp of approval on this conduct; and I feel certain that a case will arise in the future where some party has so flagrantly broken up a stable marriage that we would rue the day that an alienation suit was not available to the injured party.

*Id.* at 823 (concurring specially in part, and concurring in result in part) and,

2. —reread *this* case!

AMUNDSON, Justice (dissenting).

[¶ 66.] I respectfully dissent as to issue four and would hold the trial court erred in denying the proposed jury instruction.

[¶ 67.] On the one hand, the majority opinion holds on issue five that prior acts evidence was admissible and relevant for proving specific intent on the part of Kennedy. On the other hand, on issue four, the majority endorses the trial court's failure to give defendant's proposed pattern jury instruction number 46–01, which would have clearly set forth the element of intent. I believe it is patently contradictory for the majority to allow prior acts in under the rationale of proving the element of intent, but then affirm the giving of instruction that does not require the jury to find intent as a necessary element of the claim. It is obvious plaintiff understood the use of prior acts to prove specific intent as he proposed it, but then successfully objected to an instruction that would have shown same. Argument by plaintiff's counsel at the hearing for the motion on prior bad acts was as follows:

So this is a case where what we have to prove at least in accordance with the Court's proposed instructions here is that Myles Kennedy intentionally enticed the affections ... of Julie Veeder from Mike Veeder. And one of the ways we can show that is through a prior bad act. It is absolutely necessary evidence to our case.

[¶ 68.] The defendant's proposed jury instruction stated in regard to the first element that plaintiff must prove "defendant intended from the outset to entice the affections of one spouse away from the other." See ¶ 33.

Such language specifically tracks this Court's decisions emphasizing that an action for alienation of affections is an intentional tort. *Pickering v. Pickering,* 434 N.W.2d 758, 763 (S.D.1989); *Pankratz v. Miller,* 401 N.W.2d 543, 549 (S.D.1987). In *Pankratz,* this Court, adopting rationale of the Minnesota Supreme Court in *Pedersen v. Jirsa,* 267 Minn. 48, 125 N.W.2d 38, 43 (1963), stated: " 'The gravamen of an action for alienation of affections is enticement. It is based on an intentional tort,[21] not negligence. The acts which lead to the loss of affection must be wrongful and intentional, calculated to entice the affections of one spouse away from the other[.]' " 401 N.W.2d at 549 (emphasis added). While this Court has adopted intent as a required element, the majority is not requiring that it be included in the instructions to the jury. Moreover, not only has the majority affirmed an instruction absent intent, but the term, "wrongful conduct," has not even been defined in these instructions. The majority excuses this omission by contending that the instructions, when construed together, "provide the jury with more than adequate guidance on the intent requirement that must be met[.]" See ¶ 39. The instruction approved by majority amounts to no more than sending the jury on an Easter egg hunt to find whether or not intent is a required element. When jury instructions mislead, conflict, or confuse the jury, it constitutes reversible error. *Schaffer v. Edward D. Jones & Co.,* 1996 SD 94, ¶ 19, 552 N.W.2d 801, 808; *Wallahan v. Black Hills Elec. Coop., Inc.,* 523 N.W.2d 417, 423 (S.D.1994). By not including the required element of intent in the instructions, Kennedy was denied a fair trial by this jury.

[¶ 69.] The record reflects a spouse who repeatedly testified there were no affections to be alienated. While the majority places great emphasis on letters Julie Veeder had written expressing she missed her old life, if one looks at the record, these letters were written because of problems that arose in

---

21. This Court, in previous decisions defining intentional tort, required *actual* intent to cause the result to be shown. *See Harn v. Continental Lumber Co.,* 506 N.W.2d 91, 96 (S.D.1993); *Bra-* *zones v. Prothe,* 489 N.W.2d 900, 907 (S.D.1992); *Jensen v. Sport Bowl, Inc.,* 469 N.W.2d 370, 372 (S.D.1991); *VerBouwens v. Hamm Wood Products,* 334 N.W.2d 874, 876 (S.D.1983).

regards to child custody.[22] This is not an uncommon event to see as a consequence of marriage dissolution.

[¶ 70.] When Julie requested Mike drop the lawsuit for the sake of their children, Mike responded: "[T]ell Myles to write me a check, and I might drop it.... [W]hen this is over he [Mike] was going to buy a Corvette and buy a license plate that said[,] '[T]hanks Myles' on it.". Based upon inadequate instructions given, it now appears Plaintiff will indeed be driving a Corvette for which he can thank Myles.

[¶ 71.] I would reverse and remand for proper instructions.

22.  Julie testified:
It was Christmas. I had gotten a letter that—from Mike's attorney at that time that he was seeking custody of Brent to have him come back to Watertown. I came back at Christmas time and dropped the kids off. Christmas has always been something that I've always taken care of, and I didn't have that. I[saw] the kids for three hours on Christmas day and didn't see them on Christmas Eve, and then I left Jill and Brent in Watertown for a week until school started, and I was loosing them.... I thought if this was the only way to have them I would do that.